UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - -x
:

**12 M   442**

UNITED STATES OF AMERICA

        - v. -

THE PREMISES KNOWN AND DESCRIBED
AS 60 4th AVENUE, BROOKLYN, NEW
YORK

      :

      :

      :

      :

      :

**AFFIDAVIT FOR
SEARCH WARRANT**

(Title 18, United States
Code, Sections 1343,
1344, and 1349).

- - - - - - - - - - - - - - - -x

STATE OF NEW YORK       )
COUNTY OF KINGS        )   ss.:
EASTERN DISTRICT OF NEW YORK  )

     I, OLGA NOVOSAD, being duly sworn, depose and say:

     1.    I am a Special Agent with the Federal Bureau of

Investigation ("FBI").  I have been a Special Agent since 2007

and am currently assigned to a squad that investigates, among

other things, financial frauds.  In the course of my duties as a

Special Agent I have participated in numerous investigations of

mortgage fraud, bank fraud, and other financial frauds and, in

the course of those investigations, I have participated in the

execution of numerous search warrants for evidence of such

crimes.

     2.    I respectfully submit this affidavit in support of

the Government's application for a warrant to search the premises

known and described as: 60 4th Avenue, Brooklyn, New York (the

"PREMISES").  Based upon the facts set forth in this affidavit,

there is probable cause to believe that there is presently

located at the PREMISES evidence and instrumentalities of violations of federal law, including violations of Title 18, United States Code, Sections 1341 (mail fraud), 1343 (wire fraud), 1344 (bank fraud), and conspiracy to commit those offenses. Such evidence consists of the items set forth in Attachment A to the Search Warrant.

3. The facts in this affidavit are based upon my personal participation in this investigation, including my review of documents and interviews of witnesses; my discussions with other law enforcement agents who have participated in this investigation; and my review of reports written by other agents. Because this affidavit is made for the limited purpose of obtaining a search warrant, I have not set forth each and every fact learned relating to this investigation. Rather, I have set forth only those facts that I believe are necessary to establish probable cause for the search warrant sought herein. Unless otherwise indicated, where actions, conversations and statements of others are related herein, they are related in substance and in part.

**THE PREMISES**

4. I have seen the PREMISES, which consists of a two-story attached building having an address of 60 4th Avenue, Brooklyn, New York. The second story of the PREMISES is red

2.

brick and the first story is painted dark gray or black and has a metal roll-down grate securing a portion of the front of the building.  According to a cooperating witness who has visited the PREMISES (see paragraphs 8 and 9 below), the entrance to the PREMISES is a glass door.  The PREMISES are located on the western side of 4th Avenue in Brooklyn, New York, between Dean Street and Bergen Street.  The PREMISES bears a sign reading: "LAW OFFICE, REAL ESTATE, 60 4th AVENUE, 718-222-0043."

### PROBABLE CAUSE TO BELIEVE THAT ABAKPORO AND PIERCE COMMITTED BANK AND WIRE FRAUD

5.    This application for a search warrant arises out of an investigation that has been conducted by the New York State Attorney General's Office and the Federal Bureau of Investigation of Ifeanyichukwu Eric Abakporo and Latanya Pierce, the defendants.  On or about April 26, 2012, a federal grand jury in the Southern District of New York returned a sealed four-count indictment, 12 Cr. 340 (SAS) (the "Indictment"), charging Abakporo and Pierce with wire fraud and bank fraud, in violation of Title 18, United States Code, Section 1343 (Count One); conspiracy to commit wire fraud, in violation of Title 18, United States Code, Section 1349 (Count Two); bank fraud, in violation of Title 18, United States Code, Section 1344 (Count Three); and conspiracy to commit bank fraud, in violation of Title 18, United

States Code, Section 1349 (Count Four).  A copy of the Indictment is attached hereto as <u>Exhibit 1</u> and is incorporated by reference as if set forth fully herein.

6.    In summary, in 2006 Abakporo and Pierce entered into an agreement with an individual (the "Victim") to purchase from the Victim a residential apartment building at 1070 St. Nicholas Avenue, New York, New York (the "Property").  In 2006, after gaining control of the Property, Abakporo and Pierce used the Property in order to obtain a $1.8 million mortgage loan (the "Mortgage") from Washington Mutual Bank (the "Bank") that has since gone into default.

7.    As part of the investigation, I and other law enforcement agents have spoken with numerous individuals who participated in the sale of the Property and in obtaining the Mortgage.  As part of the investigation, I and other law enforcement agents have also reviewed, among other things, bank account records for Abakporo, Pierce, and Creekhill Realty LLC, a limited liability corporation of which Pierce is the managing member ("Creekhill Realty"); records relating to the Mortgage provided by the mortgage broker and by the Bank; and records relating to the transfer of the Property to Creekhill Realty that were provided by the various individuals who participated in or were present at the closing.

4

8.    From speaking with the Victim, a relative of the Victim ("Relative-1"), and the Victim's real estate broker, I learned the following:

a.    Up until 2006, the Victim had owned and managed the Property for more than 40 years as a rent-stabilized building offering affordable housing to Harlem residents.

b.    In 2006, when the Victim was approximately 76 years old, the Victim decided to sell the Property.  She retained a broker, and later retained another individual as a co-broker ("CW")[1].

9.    From speaking with the CW, I learned the following:

a.    The CW met Abakporo in approximately 2003. The CW met with Abakporo at Abakporo's office, which was also at the PREMISES at that time.

b.    The CW worked with Abakporo and others on real estate transactions that involved mortgage fraud in approximately 2003 or 2004.  Among these were fraudulent mortgage

_____

[1]  The CW has pleaded guilty pursuant to a cooperation agreement to a superseding information that includes charges relating to the transfer of the Property from the Victim to Creekhill Realty, as well as other offenses involving bank and wire fraud relating to personal loans and mortgage loans.  The CW has provided information in the hopes of obtaining leniency at sentencing, and the information provided by the CW has proved to be reliable.

5

transactions involving real property located at (i) 147-08 Hook Creek Blvd., Queens, NY; (ii) 218-51 110th Ave., Queens, NY; (iii) 215A Lexington Ave., Brooklyn, NY; and (iv) 185 Montauk Ave, Brooklyn, NY; among others.

      c.   In 2006, the CW introduced Abakporo to the Victim as a potential buyer of the Property.

      d.   As part of the CW's introduction of Abakporo to the Victim, Abakporo promised the CW $25,000 if the Victim sold the Property to Abakporo, in addition to any broker's commission.

      e.   The CW has been to the PREMISES in connection with his prior business dealings with Abakporo, as described above. At the PREMISES, the CW saw Abakporo's wife create documents relating to real estate and mortgage loan transactions on a computer and print them, and Abakporo would then sign the computer-generated documents.

      10.   From reviewing the contract of sale of the Property, provided by the Victim and the Victim's Attorney, I learned that on or about March 22, 2006, Abakporo signed a contract of sale as President of "Top Hill" (hereinafter, "Tophill")[2] agreeing to buy the Property for $3.1 million.

─────────────────────

     [2] Publicly available records from the State of Pennsylvania show that Tophill Properties, Inc., is a Pennsylvania business

Abakporo later assigned the contract to Creekhill Realty, an entity controlled by Pierce, pursuant to an assignment of contract signed by Abakporo and the Victim.

11.  From the Victim and the Victim's Attorney, I learned that at the closing, Abakporo represented to the Victim that he was the attorney for Creekhill Realty. Abakporo and Pierce presented the Victim with at least four checks, including two cashier's checks ("Check-1" and "Check-2"), each in the amount of $500,000 and made payable to the Victim.

12.  I learned from speaking to an individual ("Individual-1") that Abakporo and Pierce obtained Check-1 and Check-2 with the assistance of Individual-1. Abakporo and Pierce had pre-arranged with Individual-1 that both of those checks would be returned to Individual-1 after the conclusion of the Closing, which, in fact, is what occurred.

13.  I learned from the Victim that she did not know that these checks were intended to be returned to Individual-1.

14.  In addition, after reviewing copies of the checks as provided to me by the Victim, the Victim's Attorney, and the Closing Attorney, I found a check drawn on an account held in the name of "IOLA-IOLA-ERIC Abakporo" in the amount of approximately

---

corporation having Abakporo as an officer.

$799,245.63 made payable to the Victim ("Check-3"). Law enforcement officers have reviewed Abakporo's bank account related to his IOLA-IOLA ERIC Abakporo bank account and determined that during the month of August 2006, the balance of the IOLA-IOLA ERIC Abakporo account never exceeded approximately $24,000.

15.   I learned from speaking to an attorney representing a private lender ("Closing Attorney") that for the closing, Abakporo and Pierce caused Creekhill Realty to obtain $600,000 from a private lender (the "Private Lender"). After speaking with the Closing Attorney, I learned that at Abakporo and Pierce's request, the Private Lender sent an interstate wire transfer totaling $600,000 to the Closing Attorney in connection with the sale of the Property.

16.   I learned from the Victim and the Closing Attorney that at the Closing, a check of approximately $252,754.37, payable to the Victim, was given to the Victim ("Check-4"), which represented the balance of the $600,000 from the Private Lender after the payment of certain closing costs.

17.   I further learned from reviewing bank records that Abakporo deposited Check-4 (for $252,754.37) into an account held in the name of "IOLA-ERIC ABAKPORO."

18.  I learned from the Victim, Relative-1 (as defined below), and the Victim's Attorney that the Victim was ultimately paid only a small fraction of the purchase price.  According to publicly available records maintained by the New York City Clerk's Office, the Property was deeded to Creekhill Realty on or about August 3, 2006.

19.  I learned from speaking with the Victim and with a relative of the Victim ("Relative-1") that after the Victim's attorney left the Closing, Abakporo and Pierce induced the Victim to return to them Check-1 (for $500,000) and Check-2 (for $500,000).  The Victim and Relative-1 further informed me that several days later, Abakporo and Pierce induced the Victim to return to them Check-3 ($799,245.63) and Check-4 (for $252,754.37).  Abakporo and Pierce informed the Victim that in exchange for returning these four checks to the defendants, Creekhill Realty would pay the Victim $10,000 a month and would pay $64,000 on behalf of the Victim's Relative in a real estate transaction.

20.  After speaking with the Victim and Relative-1 and reviewing documents provided to me by the Victim and Relative-1, I learned that on or about December 1, 2006, the Victim and Pierce signed a typed document stating that The Victim had agreed to loan Creekhill Realty the amount of $1,988,000.00 as a

"private mortgage on the [Property]" (the "Private Mortgage Agreement").

21.   Moreover, on or about May 9, 2007, the Victim and the Pierce signed a typed amendment to the Private Mortgage Agreement (the "Amended Private Mortgage Agreement").

22.   I further reviewed the Private Mortgage Agreement dated December 1, 2006, and the Amended Private Mortgage Agreement dated May 9, 2007, that memorialized the above-stated agreement between the Victim and Abakporo and Pierce.  The Private Mortgage Agreement provided that Creekhill Realty would make monthly interest payments of $10,000 to the Victim until the entire principal of the Private Mortgage was repaid on or before November 30, 2007.  I learned from speaking with the Victim, however, that Creekhill Realty stopped making those interest payments after only the first few months.

23.   I learned from speaking to the Victim that since at least on or about May 9, 2007, no payments of any amount have been made to the Victim.

24.   After reviewing publicly available databases maintained by the New York City Clerk's Office, I learned that Abakporo and Pierce never recorded the private mortgage.

25.   I learned from speaking with others who have spoken to an individual who was involved in the Mortgage and at

10

the time an employee of the Bank (the "Bank Representative") and with a mortgage broker representing Creekhill in obtaining the Mortgage (the "Mortgage Broker") that Abakporo and Pierce applied for a mortgage on the Property for $1.8 million.  In addition, I reviewed documents submitted by Abakporo and Pierce wherein Abakporo and Pierce warranted to the Bank that Creekhill Realty owned the Property "free and clear" of any liens or other encumbrances.  The Bank Representative and Mortgage Broker stated the following:

a.   Abakporo and Pierce obtained a $1.8 million mortgage loan from the Bank, secured by the Property, on or about May 11, 2007 ("$1.8 Million Loan").

b.   The defendants also failed to repay the $1.8 Million Loan to the Bank, and the Mortgage went into default.

c.   According to the Bank Representative and the Mortgage Broker, Abakporo and Pierce represented to the Bank that Creekhill Realty had purchased the Property for $3.1 million, including $1.9 million in cash.

26.   I further learned from reviewing the mortgage loan documents that Abakporo and Pierce represented that Creekhill Realty had full power and authority to mortgage the Property to the Bank and that the Property was free and clear of any liens, charges, and other monetary encumbrances.

11

27.  Furthermore, after reviewing a typed letter dated May 11, 2007, signed by Abakporo on behalf of Creekhill Realty, and submitted to the Bank, I learned that Abakporo and Pierce represented that there were no threatened claims, lawsuits or litigation regarding the Property (the "May 11, 2007 Letter"). This representation was false: as I learned from speaking with the Victim's attorney and reviewing letters sent by the Victim's attorney to Abakporo, the Victim, through her attorney, had already contacted Abakporo and Pierce in writing and threatened litigation unless the defendants paid the monies owed to the Victim on the Property, which included rents collected by the defendants prior to the Closing.

### PROBABLE CAUSE TO BELIEVE THE PREMISES CONTAINS EVIDENCE OF BANK AND WIRE FRAUD

28.  On April 30, 2012, the defendant, Ifeanyichukwu Eric Abakporo, was arrested pursuant to an arrest warrant issued in connection with the Indictment. Following his arrest, I advised him of his <u>Miranda</u> rights and Abakporo waived those rights (both orally and in writing). He then stated, in substance and in part, the following:

a.  Abakporo has a law office located at 60 4th Avenue, Brooklyn, New York. Abakporo stated that the first floor contains a reception area, and the second floor contains offices

12

and file storage. Abakporo stated in substance that he keeps records at his office and that he believes he has files relating to the Property, the attempted purchase of the Property by Tophill, and the purchase of the Property by Creekhill Realty at his office, including the contract, letters from attorneys, the assignment of the contract to Creekhill Realty, and closing records. Abakporo stated that he does not keep records at home or at a storage unit.

b.    Abakporo stated in substance that he does not use computers and that the computers are not presently working.

c.    Abakporo stated in substance that he attempted to purchase the Property from the Victim under the name Tophill, but could not get financing for the purchase. The Property was ultimately purchased by Latanya Pierce under the name Creekhill Realty.

d.    Abakporo stated in substance that he assisted Pierce in obtained a "bridge loan" of $1 million in connection with the closing.

e.    Abakporo stated in substance that the Victim agreed to give Creekhill Realty a loan from the sale proceeds to help Creekhill Realty cover an existing mortgage on the Property, and that the loan was to be secured by the Property. Abakporo

was aware of this agreement at the time Creekhill Realty obtained the Mortgage and that the agreement was not recorded.

   f.   Abakporo further stated that at the time he presented a check for $799,245.63 to the Victim for the purchase of the Property, he knew that there were insufficient funds in his bank account to cover the amount of the check.

   g.   I advised Abakporo in sum and substance that we wanted to see his files and asked him for consent to search his office, i.e., the PREMISES.  I provided Abakporo with a written consent to search form and asked him to read it aloud to me, which he did.  He then signed the consent to search form.  We could not search the office, however, because Abakporo did not have the keys to the office with him.  He stated in substance and in part that his wife had the keys.

   31.   I was later advised by an Assistant United States Attorney with the U.S. Attorney's Office for the Southern District of New York that Mr. Abakporo has revoked consent to search the PREMISES.

   32.   Although Abakporo stated that he did not use computers and that the computer or computers are not working, from my review of records relating to the Property and the Mortgage, it appears that numerous documents relating to the transfer of the Property and the Mortgage are computer-generated,

14

including, for example, the Private Mortgage Agreement, the Amended Private Mortgage Agreement, and the May 2007 letter from Abakporo to the Bank.

    a.    I also know, from my participation in investigations involving real estate transactions and mortgage loan transactions, that numerous records relating to those types of transactions are typically generated by computer and that attorneys involved in such transactions generate files and records on computer and store records on computer.

    b.    Further, as discussed above, a cooperating witness has stated that Abakporo's wife craeted documents on a computer at the PREMISES for use in mortgage and real-estate transactions, and Abakporo signed those documents.

    c.    Moreover, based on my training and experience, including my participation in this investigation and other investigations of fraud involving financial institutions, I have learned that computers are frequently used by lawyers and other professionals to store files relating to real estate, loans (including mortgages), and financial transactions and that these files typically are stored for long periods of time, even several years.  Lawyers and other professionals typically maintain banking and financial records, billing records, ledgers, journals, and other records of monies owed, maintained on behalf

15

of others (as in an IOLA account), collected, and paid on computers. If a computer is replaced, it is also common to transfer files from the prior computer to the new computer. In other investigations in which I have participated, participants in fraudulent mortgage and financial fraud schemes have used computers to create, send, and store documents related to the underlying transactions and have stored those documents for long periods of time.

## REQUEST TO SEARCH THE PREMISES

33. In light of the foregoing information, I respectfully submit that there is probable cause to believe that the PREMISES contain evidence concerning violations of Title 18, United States Code, Sections 1343, 1344, and 1349. The evidence, fruits, and instrumentalities of the offenses include the following items, which are also described in Attachment A to the Search Warrant:

a. documents,[3] records, and correspondence

---

[3] As used herein, the term "documents" means any and all tangible forms of expression, in any language or format, including drafts or finished versions, originals, copies, or annotated copies, however created, produced or stored (manually, mechanically, electronically, electromagnetically, or otherwise), including without limitation: books, papers, files, writings, handwritten notes, typewritten notes, letters, correspondence, memoranda, notebooks, ledgers, term sheets, telexes, telefaxes, telephone message slips, tape recordings, magnetic tapes, digital recordings, electronic recordings, photographs, computerized

relating to:

        i.    1070 St. Nicholas Avenue, New York, NY;

        ii.   Latanya Pierce;

        iii.  Tophill Properties, Inc.;

        iv.   Creekhill Realty, LLC;

        v.    any mortgage secured by 1070 St. Nicholas Avenue, New York, NY;

        vi.   Frontline Ventures;

        vii.  1070 St. Nicholas Funding Associates;

        viii. Green Assets, Inc.;

        ix.   WRA Properties, Inc.;

        x.    147-08 Hook Creek Blvd., Queens, NY;

        xi.   218-51 110th Ave., Queens, NY;

        xii.  215A Lexington Ave., Brooklyn, NY;

        xiii. 185 Montauk Ave, Brooklyn, NY; and

        xiv.  Any individuals associated with the above entities, transactions or properties.

        b.   financial records, including but not limited to Abakporo, Pierce, Creekhill Realty, and Tophill Properties, including cancelled checks, wire transfer records, bank account

---

records stored on computer hard-drives, computer disks, computer
hard-drives, recorded telephone messages, recorded fax
transmissions, electronic mail messages, voice mail messages,
microform, and microfiche.

statements, ledgers, and journals;

     c.   Records reflecting the commission of mortgage fraud or financial fraud; and

     d.   I also request permission to open any type of locked or closed containers that may contain such documents, records, and correspondence, and to seize and use any keys that may open such locked or closed containers.

     34.  In sum, based on the foregoing information and on my training and experience I believe and submit that there is probable cause to believe that located on the PREMISES will be documentary evidence of Abakporo's and Pierce's participation in the scheme to obtain the Property, the sale proceeds, and the Mortgage. Specifically, based on Abakporo's post-arrest statement that he believed there were documents related to the purchase of the Property from the Victim within the Premises, based on information law enforcement officers obtained from the CW concerning Abakporo's participation in other fraudulent mortgage transactions, and based on Abakporo's representation as the attorney of Creekhill, I believe there is sufficient probable cause to search the PREMISES.

## METHODS TO BE USED TO SEIZE AND SEARCH FILES

     35.  Based upon my training, experience, and information related to me by other agents, I know that the files

18

contained at the PREMISES may consist of, among other things, mortgage and loan applications; supporting documentation for such applications, including verification of rent and employment, financial records, credit reports, identification documents or photocopies of identification documents, and other documentation in the names of the borrowers; underwriting materials; records of disbursements of loan proceeds; settlement statements provided to mortgage lenders; and title search records.

36. Files may be stored in locked or secured containers, such as locked file drawers or locked file cabinets.

37. In order to identify and seize files relating to the items described in paragraph 33, an initial review of documents, records, and files will be conducted at the PREMISES by a limited "filter team" supervised by federal law enforcement agents and assisted by investigators with the New York State Attorney General's Office, which investigators will be familiar with real estate transactions, mortgage loans, and related records. The members of the filter team will conduct a preliminary examination of files in order to determine whether they appear to relate to the items set forth in paragraph 33. These files will be seized by the filter team.

38. For the reasons described above, I respectfully submit that the materials to be searched are unlikely to contain

19

privileged attorney-client communications. As described above, Abakporo acted as both an attorney and as a principal with respect to the purchase of the Property, and acted in both a legal and a business capacity. Second, it appears that the crime-fraud doctrine or other exceptions to the attorney-client privilege are likely to apply.

39. However, in the event that a member of the filter team reviews a document, record, or data that is arguably a privileged communication, that document, record, or data will be reviewed by a designated Assistant United States Attorney, who will be a member of the filter team and will not be a member of the prosecution team. If the designated Assistant determines that the materials contain or reflect privileged communications, the Assistant will maintain a sealed copy of the relevant communication, record, or data and the original will be returned to the PREMISES.

### METHODS TO BE USED TO SEIZE AND SEARCH COMPUTERS AND COMPUTER-RELATED EQUIPMENT

40. Based upon my training, experience, and information related to me by other agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices including hard disk drives, floppy disks, compact disks, magnetic

20

tapes and memory chips.  I also know that searching computerized
information for evidence or instrumentalities of a crime commonly
requires agents to seize most or all of a computer system's
input/output peripheral devices, related software documentation,
and data security devices (including passwords) so that a
qualified computer expert can accurately retrieve the system's
data in a laboratory or other controlled environment.  This is
true for the following reasons:

a.    Searching computer systems is a highly
technical process which requires specific expertise and
specialized equipment.  There are so many types of computer
hardware and software in use today that it is impossible to bring
to the search site all of the necessary technical manuals and
specialized equipment necessary to conduct a thorough search.  In
addition, it may also be necessary to consult with computer
personnel who have specific expertise in the type of computer,
software application, or operating system that is being searched.

b.    Searching computer systems requires the use
of precise, scientific procedures which are designed to maintain
the integrity of the evidence and to recover "hidden," erased,
compressed, encrypted, or password-protected data.  Computer
hardware and storage devices may contain "booby traps" that
destroy or alter data if certain procedures are not scrupulously

21

followed. Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted.

c. The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing up to 500 gigabytes of data are now commonplace in desktop computers. Consequently, each non-networked, desktop computer found during a search can easily contain the equivalent of millions of pages of data.

d. Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that

the file contains text.  Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.  In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography a computer user can conceal text in an image file which cannot be viewed when the image file is opened.  Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband, or instrumentalities of a crime.

41.   In searching for data capable of being read, stored, or interpreted by a computer, law enforcement personnel executing this search warrant will employ the following procedure:

a.   Upon securing the premises, law enforcement personnel will seize computers or computer equipment found on the PREMISES to be transported to an appropriate law enforcement laboratory for review.

b.   The analysis of electronically stored data may entail any or all of several different techniques.  Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain

23

(analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); "opening" or reading the first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "key-word" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

        c.    Upon the search of the computers, computer equipment, and storage devices, with respect to any data that relates to the items set forth in paragraph 33, a copy of those files will be made and kept. The filter team will not transmit any of the other information to the prosecution team.

        d.    If upon the search of the computers, computer equipment, and storage devices it is determined that the computer equipment and storage devices do not contain contraband, an instrumentality of the offense, a fruit of the criminal activity, or evidence of the offense specified above, then the computer personnel will return the computer equipment and storage devices to the Premises.

        c.    The analysis of electronically stored data

may entail any or all of several different techniques. Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); "opening" or reading the first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "key-word" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

42. Any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (i) an instrumentality of the offense, (ii) a fruit of the criminal activity, (iii) contraband, (iv) otherwise unlawfully possessed, or (v) evidence of the offense specified above.

43. In addition, the computer personnel may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the data falls within the list of items to be seized as set forth in this affidavit.

44.   If the computer personnel determine that the computers, computer equipment and storage devices are no longer necessary to retrieve and preserve the data, and the items are not subject to seizure pursuant to Federal Rule of Criminal Procedure 41(b), the Government will return these items, upon request.

45.   In order to search for data from computers, computer equipment and storage devices, law enforcement personnel will need to seize and search the following items, subject to the procedures set forth above: any passwords, password files, test keys, encryption codes, or other information necessary to access the computer equipment, storage devices, or data.

46.   The procedures for reviewing potential privileged materials described above in paragraphs 37-39 will also be applied to electronic data found on an computers, computer equipment, or storage devices.

## CONCLUSION

47.   Based upon the foregoing, I respectfully request
that the Search Warrant sought in this affidavit issue pursuant
to Rule 41 of the Federal Rules of Criminal Procedure, permitting
authorized agents or officers to enter the Premises and therein
to search for and seize the items listed in Schedule A to the
Search Warrant.

SPECIAL AGENT OLGA NOVOSAD
FEDERAL BUREAU OF INVESTIGATION

Sworn to before me this
3rd day of May, 2012

HONORABLE ROBERT LEVY
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

## Attachment A

a.    documents,[4] records, and correspondence relating to:

i.      1070 St. Nicholas Avenue, New York, NY;
ii.     Latanya Pierce;
iii.    Tophill Properties, Inc.;
iv.     Creekhill Realty, LLC;
v.      any mortgage secured by 1070 St. Nicholas Avenue, New York, NY;
vi.     Frontline Ventures;
vii.    1070 St. Nicholas Funding Associates;
viii.   Green Assets, Inc.;
ix.     WRA Properties, Inc.;
x.      147-08 Hook Creek Blvd., Queens, NY;
xi.     218-51 110th Ave., Queens, NY;
xii.    215A Lexington Ave., Brooklyn, NY;
xiii.   185 Montauk Ave, Brooklyn, NY; and
xiv.    Any individuals associated with the above entities, transactions or properties.

b.    financial records, including but not limited to Abakporo, Pierce, Creekhill Realty, and Tophill, including cancelled checks, wire transfer records, bank account statements, ledgers, and journals;

c.    Records reflecting the commission of mortgage fraud or financial fraud; and

---

[4]  As used herein, the term "documents" means any and all tangible forms of expression, in any language or format, including drafts or finished versions, originals, copies, or annotated copies, however created, produced or stored (manually, mechanically, electronically, electromagnetically, or otherwise), including without limitation: books, papers, files, writings, handwritten notes, typewritten notes, letters, correspondence, memoranda, notebooks, ledgers, term sheets, telexes, telefaxes, telephone message slips, tape recordings, magnetic tapes, digital recordings, electronic recordings, photographs, computerized records stored on computer hard-drives, computer disks, computer hard-drives, recorded telephone messages, recorded fax transmissions, electronic mail messages, voice mail messages, microform, and microfiche.

# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA            :

    - v. -                         :      INDICTMENT

IFEANYICHUKWU ERIC ABAKPORO and     :      12 Cr.
LATANYA PIERCE,
                                    :

        Defendants.

- - - - - - - - - - - - - - - -x

**12 CRIM 340**

### COUNT ONE

#### (Conspiracy to Commit Wire Fraud)

    The Grand Jury charges:

#### Background

    1.    At all times relevant to this Indictment,
IFEANYICHUKWU ERIC ABAKPORO, the defendant, was an attorney who
maintained a law office in Brooklyn, New York.  Abakporo
controlled an entity called Top Hill Properties, Inc. ("Top
Hill").

    2.    At all times relevant to this Indictment, LATANYA
PIERCE, the defendant, worked in the law office of IFEANYICHUKWU
ERIC ABAKPORO, the defendant.  PIERCE controlled an entity called
Creekhill Realty, LLC ("Creekhill Realty").

#### The Scheme to Defraud Victim-1

    3.    From in or about 2006 up to and including at least
in or about May 2007, IFEANYICHUKWU ERIC ABAKPORO and LATANYA
PIERCE, the defendants, and other co-conspirators known and
unknown, participated in a scheme to defraud an elderly

individual ("Victim-1") who owned a residential apartment
building located at 1070 St. Nicholas Avenue in Manhattan, New
York (the "Property"). Up until 2006, Victim-1 had owned and
managed the Property for more than 40 years as a rent-stabilized
building offering affordable housing to Harlem residents. As
Victim-1's physical and mental health declined, ABAKPORO and
PIERCE took advantage of Victim-1 to take by fraud Victim-1's
money and the Property.

    4. As a part of the scheme to defraud, IFEANYICHUKWU
ERIC ABAKPORO and LATANYA PIERCE, the defendants, earned Victim-
1's trust by representing to her that they would help manage the
Property by collecting rent from tenants on Victim-1's behalf.
Between approximately March 2006 and August 2006, with Victim-1's
approval, ABAKPORO and PIERCE collected rent payments from
tenants of the Property. However, unbeknownst to Victim-1,
ABAKPORO and PIERCE misappropriated those rent payments by
depositing them into their own bank accounts.

    5. As a further part of the scheme to defraud, in or
about 2006, IFEANYICHUKWU ERIC ABAKPORO and LATANYA PIERCE, the
defendants, made false representations that caused Victim-1 to
sell the Property to ABAKPORO and PIERCE. Among other false
representations, ABAKPORO and PIERCE represented to Victim-1 that
they would pay her $3.1 million to purchase the Property.
Specifically, on or about March 22, 2006, ABAKPORO signed a

-2-

contract of sale as President of Top Hill, agreeing to purchase

the Property from Victim-1 for $3.1 million. ABAKPORO later

signed a contract assigning the right to purchase the Property to

Creekhill Realty, the entity controlled by PIERCE and for which

ABAKPORO acted as attorney. In truth and in fact, however,

ABAKPORO and PIERCE had no intention of paying Victim-1 $3.1

million, and did not do so. Instead, at the closing of the sale

of the Property, which occurred on or about August 3, 2006 ("the

Closing"), ABAKPORO and PIERCE presented Victim-1 with multiple

fake and fraudulent checks, including:

a. two cashier's checks ("Check-1" and "Check-

2"), each in the amount of $500,000 and made payable to Victim-1,

that ABAKPORO and PIERCE never intended to allow Victim-1 to keep

or deposit. ABAKPORO and PIERCE obtained Check-1 and Check-2

with the assistance of an individual ("Individual-1").

Unbeknownst to Victim-1 or Victim-1's attorney, ABAKPORO and

PIERCE had pre-arranged with Individual-1 that both of those

checks would be returned to Individual-1 after the conclusion of

the Closing, which, in fact, is what occurred as described below

in paragraph 8; and

b. a check drawn on an account held in the name

of "IOLA-IOLA-ERIC ABAKPORO" in the amount of approximately

$799,245.63 made payable to Victim-1 ("Check-3"). Unbeknownst to

Victim-1 or Victim-1's attorney, Check-3 was fraudulent too, as

during the month of August 2006, the balance of the IOLA-IOLA-ERIC ABAKPORO account never exceeded approximately $24,000. ABAKPORO and PIERCE knew the account did not have sufficient funds to cover Check-3, and never intended to allow Victim-1 to keep or deposit Check-3.

6.     For the Closing, IFEANYICHUKWU ERIC ABAKPORO and LATANYA PIERCE, the defendants, also obtained $600,000 from a private lender ("Private Lender"). ABAKPORO and PIERCE caused the Private Lender to send an interstate wire transfer totaling $600,000 to their attorney for the sale of the Property. At the Closing, a check of approximately $252,754.37, payable to Victim-1, was given to Victim-1 ("Check-4"), which represented the balance of the $600,000 from the Private Lender after the payment of certain closing costs.

7.     While IFEANYICHUKWU ERIC ABAKPORO and LATANYA PIERCE, the defendants, fraudulently promised and contracted to pay $3.1 million for Creekhill Realty to buy the Property, in fact, ABAKPORO and PIERCE ultimately paid only a small fraction to Victim-1. ABAKPORO and PIERCE provided Victim-1 with $1,000,000 in checks (Check-1 and Check-2) that they had already promised to return to Individual-1 after the Closing. In addition, ABAKPORO and PIERCE also provided a fraudulent check (Check-3) with insufficient funds and the check from the Private Lender (Check-4), both of which they also intended to recover, as

-4-

described below.  As a result of the defendants' fraud, Victim-1
deeded the Property to Creekhill Realty on or about August 3,
2006, and the defendants gained control of the Property.

8.  As a further part of the scheme to defraud, after
Victim-1's attorney left the Closing, IFEANYICHUKWU ERIC ABAKPORO
and LATANYA PIERCE, the defendants, fraudulently induced Victim-1
to return to them Check-1 (for $500,000) and Check-2 (for
$500,000).  Several days later, ABAKPORO and PIERCE fraudulently
induced Victim-1 to return to them Check-3 ($799,245.63) and
Check-4 (for $252,754.37).  ABAKPORO and PIERCE falsely
represented that in exchange for returning these four checks to
the defendants, Creekhill Realty would pay Victim-1 $10,000 a
month (as set forth in paragraph 10 below) and would pay $64,000
on behalf of Victim-1's relative in a real estate transaction.
In truth and in fact, ABAKPORO and PIERCE knew at the time that
nearly all of the purported "funds" that Victim-1 was returning
to them were non-existent, because the checks given to Victim-1
at the Closing were fraudulent, expected to be returned to
Individual-1, and/or unsupported by actual funds.  ABAKPORO and
PIERCE knew there were no funds behind Check-3, and that Check-1
and Check-2 were going to be returned to Individual-1.  Lastly,
ABAKPORO deposited Check-4 (for $252,754.37) into an account held
in the name of "IOLA-ERIC ABAKPORO."

-5-

9.    As a further part of the scheme to defraud, on or about December 1, 2006, IFEANYICHUKWU ERIC ABAKPORO and LATANYA PIERCE, the defendants, caused Victim-1 to sign, and PIERCE herself signed, a document stating that Victim-1 had agreed to loan Creekhill Realty the amount of $1,988,000.00 as a "private mortgage on the [Property]" (the "Private Mortgage Agreement"). While ABAKPORO and PIERCE thus represented and agreed in writing that Victim-1 maintained a private mortgage on the Property, unbeknownst to Victim-1, ABAKPORO and PIERCE never recorded the private mortgage, and subsequently applied to mortgage the Property through Washington Mutual Bank ("the Bank") for $1.8 million, while falsely warranting to the Bank that Creekhill Realty owned the Property "free and clear" of any liens or other encumbrances.  ABAKPORO and PIERCE in fact obtained a $1.8 million mortgage loan from the Bank, secured by the Property, on or about May 11, 2007 ("$1.8 Million Loan").

10.   As a further part of the scheme to defraud, IFEANYICHUKWU ERIC ABAKPORO and LATANYA PIERCE, the defendants, promised and agreed as part of the Private Mortgage Agreement to make monthly interest payments of $10,000 to Victim-1 until the entire principal of the Private Mortgage was repaid on or before November 30, 2007.  In fact, however, the defendants stopped making those interest payments after only the first few months. Moreover, on or about May 9, 2007, the defendants fraudulently

-6-

induced Victim-1 to sign an amendment to the Private Mortgage
Agreement, extending the maturity date of the Private Mortgage to
November 30, 2011 ("Amended Private Mortgage Agreement"). Since
at least on or May 9, 2007, no payments of any amount have been
made to Victim-1. The defendants also failed to repay the $1.8
Million Loan to the Bank, and the mortgage went into default.

11. As a result of their fraud on Victim-1,
IFEANYICHUKWU ERIC ABAKPORO and LATANYA PIERCE, the defendants,
obtained in excess of $3 million of the Victim's money and
Property, comprising substantially all of Victim-1's assets.
ABAKPORO and PIERCE used the illicitly obtained money – including
the $1.8 million in mortgage proceeds obtained through the fraud
– to benefit themselves and others, including to fund other real
properties owned and controlled by them.

### Statutory Allegations

12. From at least in or about 2006 through at least in
or about May 2007, in the Southern District of New York and
elsewhere, IFEANYICHUKWU ERIC ABAKPORO and LATANYA PIERCE, the
defendants, willfully and knowingly did combine, conspire,
confederate, and agree together and with each other, and with
others known and unknown, to commit wire fraud, in violation of
Section 1343 of Title 18, United States Code.

13. It was a part and an object of the conspiracy that
IFEANYICHUKWU ERIC ABAKPORO and LATANYA PIERCE, the defendants,

-7-

and others known and unknown, willfully and knowingly, having
devised and intending to devise a scheme and artifice to defraud,
and for obtaining money and property by means of false and
fraudulent pretenses, representations, and promises, would and
did transmit and cause to be transmitted by means of wire and
radio communication in interstate and foreign commerce, writings,
signs, signals, pictures, and sounds for the purpose of executing
such scheme and artifice, in violation of Title 18, United States
Code, Section 1343.

### Overt Acts

14.   In furtherance of the conspiracy and to effect the
illegal object thereof, IFEANYICHUKWU ERIC ABAKPORO and LATANYA
PIERCE, the defendants, and others known and unknown, committed
the following overt acts, among others, in the Southern District
of New York and elsewhere:

a.   ABAKPORO and PIERCE caused $600,000 to be
transferred on or about August 2, 2006, by interstate wire to a
bank account located in the Southern District of New York.

b.   On or about August 3, 2006, ABAKPORO and
PIERCE presented Check-1, Check-2, and Check-3 to Victim-1 at a
closing of the sale of the Property.

c.   PIERCE signed the Private Mortgage Agreement
on or about December 1, 2006.

d.   PIERCE signed the Amended Private Mortgage

-8-

Agreement on or about May 9, 2007.

(Title 18, United States Code, Section 1349.)

## COUNT TWO

### (Wire Fraud)

The Grand Jury further charges:

15. The allegations set forth in paragraphs one through eleven and fourteen of this Indictment are repeated and re-alleged as if fully set forth herein.

16. From at least in or about 2006 through in or about 2007, in the Southern District of New York and elsewhere, IFEANYICHUKWU ERIC ABAKPORO and LATANYA PIERCE, the defendants, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire and radio communication in interstate commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, ABAKPORO and PIERCE engaged in a scheme to defraud Victim-1 of Property and money, and in furtherance of that scheme caused approximately $600,000 to be transferred by interstate wire on or about August 2, 2006, to an attorney trust account located in the Southern District of New York.

(Title 18, United States Code, Sections 1343 and 2.)

-9-

## COUNT THREE

### (Conspiracy to Commit Bank Fraud)

The Grand Jury further charges:

17.   The allegations set forth in paragraphs one through eleven and fourteen of this Indictment are repeated and re-alleged as if fully set forth herein.

### The Scheme to Defraud Washington Mutual Bank

18.   In or about March 2007, IFEANYICHUKWU ERIC ABAKPORO and LATANYA PIERCE, the defendants, made false and fraudulent statements to the Bank, to obtain a $1.8 mortgage loan secured by the Property.   ABAKPORO and PIERCE then used the mortgage proceeds to benefit themselves and others, and defaulted on the mortgage.

19.   As a part of the scheme to defraud, in or about March 2007, IFEANYICHUKWU ERIC ABAKPORO and LATANYA PIERCE, the defendants, caused a mortgage loan application containing false statements and representations to be sent to the Bank on behalf of Creekhill Realty, seeking a mortgage secured by the Property.

20.   Among other false representations made to the Bank during the loan application process, IFEANYICHUKWU ERIC ABAKPORO and LATANYA PIERCE, the defendants, falsely represented that Creekhill Realty had purchased the Property for $3.1 million, including $1.9 million in cash.   In truth and in fact, however, and as ABAKPORO and PIERCE well knew, Creekhill Realty never paid

-10-

$3.1 million, or $1.9 million in cash, to purchase the Property. Instead, ABAKPORO and PIERCE obtained the Property through fraud.

21.   The mortgage loan application also falsely represented that Creekhill Realty had full power and authority to mortgage the Property to the Bank and that the Property was free and clear of any liens, charges, and other monetary encumbrances. In truth and in fact, however, and as IFEANYICHUKWU ERIC ABAKPORO and LATANYA PIERCE, the defendants, well knew, Creekhill Realty had previously entered into the Private Mortgage Agreement with Victim-1, agreeing that Victim-1 had a private mortgage on the Property in the amount of $1.9 million.   ABAKPORO and PIERCE failed to disclose the Private Mortgage Agreement or the Amended Private Mortgage Agreement to the Bank.

22.   In order to obtain the $1.8 Million Loan, IFEANYICHUKWU ERIC ABAKPORO and LATANYA PIERCE, the defendants, also provided the Bank with a letter dated on or about May 11, 2007, signed by ABAKPORO on behalf of Creekhill Realty, which falsely represented that there were no threatened claims, lawsuits or litigation regarding the Property (the "May 11, 2007 Letter").   In truth and in fact, however, prior to the date when ABAKPORO provided the May 11, 2007 Letter to the Bank, Victim-1, through her attorney, had already contacted ABAKPORO and PIERCE and threatened litigation unless the defendants paid the monies owed to Victim-1 on the Property, which included rents collected by the defendants prior to the Closing.

-11-

## Statutory Allegations

23. From at least in or about 2006 through in or about 2007, in the Southern District of New York and elsewhere, IFEANYICHUKWU ERIC ABAKPORO and LATANYA PIERCE, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit bank fraud.

24. It was a part and an object of the conspiracy that IFEANYICHUKWU ERIC ABAKPORO and LATANYA PIERCE, the defendants, and others known and unknown, willfully and knowingly, would and did execute, and attempt to execute, a scheme and artifice to defraud a financial institution, the deposits of which were then insured by the Federal Deposit Insurance Corporation, and to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, such financial institution, by means of false and fraudulent pretenses, representations and promises.

(Title 18, United States Code, Sections 1344 and 2.)

## Overt Acts

25. In furtherance of the conspiracy and to effect the illegal object thereof, IFEANYICHUKWU ERIC ABAKPORO and LATANYA PIERCE, the defendants, and others known and unknown, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

-12-

      a.    In or about March 2007, ABAKPORO and PIERCE caused a mortgage application to be submitted to the Bank.

      b.    On or about May 11, 2007, ABAKPORO and PIERCE caused a letter to be provided to the Bank stating that were no other liens or encumbrances on the Property.

      c.    On or about May 11, 2007, ABAKPORO and PIERCE submitted the May 11, 2007 Letter to the Bank representing, among other things, that there were no threatened claims, lawsuits or litigation regarding the Property.

      d.    On or about May 11, 2007, PIERCE signed the $1.8 Million Loan on behalf of Creekhill Realty.

      e.    In or about May 2007, ABAKPORO and PIERCE caused Bank employees and agents to inspect the Property, which is located in Manhattan, New York.

(Title 18, United States Code, Section 1349.)

## COUNT FOUR

### (Bank Fraud)

The Grand Jury further charges:

26.    The allegations set forth in paragraphs one through eleven, fourteen, eighteen through twenty-two and twenty-four of this Indictment are repeated and re-alleged as if fully set forth herein.

27.    In or about May 2007, in the Southern District of New York and elsewhere, IFEANYICHUKWU ERIC ABAKPORO and LATANYA PIERCE, the defendants, willfully, and knowingly, did execute,

-13-

and attempt to execute, a scheme and artifice to defraud a
financial institution, the deposits of which were then insured by
the Federal Deposit Insurance Corporation, and to obtain moneys,
funds, credits, assets, securities, and other property owned by,
and under the custody and control of, such financial institution,
by means of false and fraudulent pretenses, representations and
promises, to wit, the defendants submitted and caused to be
submitted false information, among other things, to the Bank, the
deposits of which were insured by the Federal Deposit Insurance
Corporation, in order to procure a loan in the amount of
approximately $1.8 Million.

(Title 18, United States Code, Sections 1344 and 2.)

### FORFEITURE ALLEGATION

28.   As a result of committing the wire fraud and bank
fraud offenses alleged in Counts One, Two, Three, and Four of
this Indictment, IFEANYICHUKWU ERIC ABAKPORO and LATANYA PIERCE,
the defendants, shall forfeit to the United States, pursuant to
Title 18, United States Code, Section 981(a)(1)(C) and Title 28,
United States Code, Section 2461, all property, real and
personal, constituting and derived from proceeds traceable to the
commission of the offenses, including, but not limited to, the
following:

a.    All right, title, and interest in the real
property and appurtenances located at 1070 St. Nicholas Avenue,
New York, New York; and

-14-

b.   A sum of currency equal to at least approximately $2.5 million.

## Substitute Asset Provision

29.   If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendants --

    i.   cannot be located upon the exercise of due diligence;

    ii.  has been transferred or sold to, or deposited with, a third person;

    iii. has been placed beyond the jurisdiction of the Court;

    iv.  has been substantially diminished in value; or

    v.   has been commingled with other property which cannot be subdivided without difficulty;

-15-

it is the intention of the United States, pursuant to Title 18, United States Code, Section 982(b) and Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the above forfeitable property.

(Title 18, United States Code, Section 982 and
Title 21, United States Code, Section 853.)

_____
Foreperson

_____
PREET BHARARA
United States Attorney

-16-

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

### UNITED STATES OF AMERICA

- v. -

### IFEANYICHUKWU ERIC ABAKPORO and
### LATANYA PIERCE,

Defendants.

## INDICTMENT

(Title 18, United States Code,
Sections 1343, 1344, 1349, and 2)

PREET BHARARA
United States Attorney.

**A TRUE BILL**

_____
Foreperson.

4/26/12  FILED INDICTMENT  WARRANTS ISSUED

COTT, USMJ